**SIGNED THIS: June 24, 2020**

_(signature)_

_____
**Mary P. Gorman**
**United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | Case No. 01-92550 |
| TTC ILLINOIS INCORPORATED, | ) | |
| et. al., | ) | |
| | ) | Chapter 11 |
| Debtors. | ) | |

## O P I N I O N

Before the Court is a "Motion to Reopen Case For the Limited Purpose of Directing Illinois Department of Revenue to Release Illinois Protest Monies Act Deposit Consistent with Orders of this Court and Related Relief" ("Motion to Reopen"). The Motion to Reopen was filed by Oak Point Partners, LLC ("Oak Point"), in its claimed capacity as "successor by acquisition to the residual assets" of the bankruptcy estates administered in this case. For the reasons set forth herein, the Motion to Reopen will be denied.

## I. Factual and Procedural Background

### A. The TTC Chapter 11 Bankruptcy

TTC Illinois, Inc., and TTC Holdings, Inc., (collectively "TTC") filed voluntary petitions under Chapter 11 on September 4, 2001.[1] The cases were promptly consolidated.[2] Prior to its bankruptcy filing, TTC operated a professional employer organization, providing personnel management services to clients in a variety of industries. According to TTC, it did business in forty states, employed as many as 25,000 people through its service agreements, and had gross revenue in 2000 in excess of $600 million dollars. TTC offered its clients a variety of personnel-related administrative services including payroll, tax withholding, workers' compensation insurance, and other employee benefits.

According to TTC, its financial problems began in late 2000 when it learned that it workers' compensation insurance carrier was being audited by the state of Ohio. TTC began looking for alternate coverage and, in early 2001, was able to

---

[1] This Court was assigned the case on June 1, 2014, upon the retirement of the judge previously assigned. The factual background recited here comes from a review of the dockets and from a Chapter 11 Final Report and Accounting filed by TTC on December 11, 2015, in support of a request for final decree. The factual background is presented to put the Court's decision on the Motion to Reopen in context. None of the facts relating to the background recited herein appear to be disputed.

[2] Filings in the consolidated cases, for the first three years they were pending, were made on paper and were never scanned into the electronic filing system. The docket in each case shows that motions to consolidate were filed and granted and that the consolidated cases then proceeded under the case number originally assigned to TTC Illinois, Inc. The dockets do not reflect whether the consolidation was solely administrative or was also substantive. One liquidating plan was ultimately confirmed for both entities and, accordingly, at least as a practical matter, the consolidation was substantive. Because this issue does not control the outcome here, a request was not made for the paper files to be retrieved from the federal archives. Without such records, the exact terms of the consolidation order are not known.

obtain workers' compensation insurance coverage through a new carrier. But the new carrier turned out not to be licensed and was engaged in a fraudulent scheme targeted directly at companies like TTC that provide personnel services.[3] TTC's search for legitimate workers' compensation coverage continued without success until early August 2001 when it determined that it was not going to be able to acquire the coverage and terminated all of its service agreements with its clients. Many of TTC's clients filed suits against it for breach of contract and the bankruptcies were filed in September 2001.

TTC filed and subsequently obtained confirmation of a liquidating Chapter 11 plan. Ultimately, TTC recovered almost $900,000 from the liquidation of its assets and collected over $5.5 million dollars from litigation, including actions against the insurance carrier that had provided it with directors' and officers' coverage and against an insurance broker that had placed some of the problematic workers' compensation coverages.

By March 2005, TTC's only secured creditor, Fifth/Third Bank, had been paid in full, and TTC turned its attention to reviewing priority claims. The process was complicated by the fact that TTC had originally hired a claims agent to receive claims but then terminated the claims agent for poor performance. The agent's database of claims was not transferable to the Court's electronic filing system, and TTC's attorneys were required to manually review paper claims. The process took years, but eventually all employee, taxing authority, and other priority claims were reviewed and resolved. Because the amount of funds collected was insufficient to

---

[3] TTC says that thirteen people were indicted with respect to the scheme. Interestingly, two officers of TTC were among those indicted and convicted.

pay priority claims in full, general unsecured claims were not reviewed.

On December 11, 2015, TTC filed its Chapter 11 Final Report and Accounting providing details on the distribution of funds pursuant to the liquidating plan. TTC reported that all administrative expense and wage claims had been or were being paid in full and that priority tax claims would be paid in a final distribution with the expected payment to be approximately 50% of each allowed priority claim. TTC's Motion for Final Decree was also filed December 11, 2015, and was granted on January 27, 2016. The case was closed on February 11, 2016.

### B. The Illinois Department of Revenue's Claims and Issues

TTC's issues with the Illinois Department of Revenue ("IDOR"), to the extent relevant here, date back to at least 1992. IDOR filed timely claims for taxes due for 1992, 1993, 1994, 1995, 1996, and 1998. Several years after the bar date for filing claims had run, IDOR filed an amended claim, identifying additional tax liability for 1996 and including a new claim for 1997 taxes. Based on an objection filed by TTC, the claim for 1997 taxes was disallowed as untimely. Ultimately, TTC and IDOR stipulated to the allowance of IDOR's priority claims in an amount slightly in excess of $1.8 million dollars.

Relevant to the issues here are a portion of the taxes due to IDOR for 1997. In 1998, IDOR disputed the accuracy of TTC's 1997 Illinois Corporate Income and Replacement Tax return. The dispute concerned whether TTC was actually the employer of certain individuals and whether those individuals should be considered employees for purposes of determining certain payroll and sale tax

apportionment factors for tax return purposes. On November 24, 1998, in order to obtain a resolution of the issue, TTC filed an amended tax return and paid the $46,481 claimed due by IDOR under protest. On the same day, TTC filed an action in the Circuit Court of Cook County, Illinois, against IDOR and various state officers under a section of the Illinois State Officers and Employees Money Disposition Act (commonly referred to as the Protest Monies Act) seeking a refund of the taxes paid under protest.[4] *See* 30 ILCS 230/1, 2a. As required by the Protest Monies Act, TTC promptly sought and obtained an injunction requiring the State Treasurer to hold the taxes paid under protest in its protest fund account and not to deposit the funds into the general revenue accounts of the State pending further order of court.

At the time of the bankruptcy filings in September 2001, the Protest Monies Act case was still pending in Cook County. During the pendency of this case, neither TTC nor IDOR sought to have the Protest Monies Act issues resolved either in the bankruptcy court or the state court. Neither IDOR's amended claim that included 1997 taxes nor TTC's objection to that claim specifically raised the Protest Monies Act issues. The Protest Monies Act case remains pending in Cook County.

### C. The Motion to Reopen

The Motion to Reopen was filed by Oak Point as successor by acquisition to

---

[4] The case was captioned T.T.C.Holdings, Inc. & Subsidiaries, Plaintiffs, v. Kenneth E. Zehnder, as Director of the Illinois Department of Revenue, Judy Baar Topinka, as Treasurer of the State of Illinois, and the Illinois Department of Revenue, Defendants, case #98L51052.

the residual assets of the TTC estates. Attached to the Motion to Reopen is a Purchase Agreement and Assignment of Claims and Interests ("Purchase Agreement") signed by TTC and Oak Point on December 23, 2015. The Purchase Agreement provides for the transfer to Oak Point of all of TTC's rights in "Remnant Assets" that were defined as property of TTC "consisting of known or unknown assets or claims which have not been previously sold, assigned, transferred, encumbered or resolved." Oak Point agreed to pay TTC $5000 for the Remnant Assets and to take the Remnant Assets in "AS IS, WHERE IS" condition and without any warranties. No listing of any known assets included in the sale was attached to the Purchase Agreement.

In its Motion to Reopen, Oak Point claims that the disallowance of IDOR's claim for 1997 taxes based on its failure to file a timely claim for that year resulted in a substantive determination that taxes for that year cannot be collected. Oak Point also alleges that IDOR served as a custodian of the funds paid under protest and therefore had a duty to turn over those funds to TTC when the case was filed.[5] It also argues that the injunction language in the confirmed liquidating plan prohibits IDOR from enforcing its rights in the taxes paid under protest.

IDOR counters that the denial of its claim for 1997 taxes was a procedural decision based on the untimely filing and resulted only in IDOR not sharing in the liquidation distribution for those taxes. IDOR argues that the decision did not

---

[5] Strangely, Oak Point also claims that IDOR failed to disclose the payment made under protest and the pendency of the Protest Monies Act litigation to TTC during the bankruptcy. Oak Point provides no factual or legal basis, however, for the Court to conclude that TTC did not know about its own actions in making the payment under protest and filing the lawsuit in Cook County.

reach the merits of any issues related to the claimed taxes due and, in particular, did not reach the merits of the Protest Monies Act litigation that was not mentioned in the claim, the claim objection, or the Court's order finding the claim untimely. Likewise, IDOR claims that it has an ownership interest in the taxes paid under protest that was not divested by any order entered during the pendency of the bankruptcy case and that it may litigate the Protest Monies Act case now notwithstanding the injunctive provisions of the confirmed plan. IDOR also says that, because some of its allowed claims were not paid in full, even if TTC or its successor, Oak Point, were to prevail on the substance of the Protest Monies Act litigation, IDOR could use any refund due to satisfy other outstanding tax liabilities of TTC.

The issues have been fully briefed by the parties and are ready for decision.

## II. Jurisdiction

This Court has jurisdiction over the issues before it pursuant to 28 U.S.C. §1334. All bankruptcy cases and proceedings filed in the Central District of Illinois have been referred to the bankruptcy judges. CDIL-Bankr. LR 4.1; *see* 28 U.S.C. §157(a). The decision on whether to reopen this case under the circumstances presented relates to the administration of the case and is a core proceeding. 28 U.S.C. §157(b)(2)(A). The issue of reopening arises from the Debtor's bankruptcy itself and from the provisions of the Bankruptcy Code and may therefore be constitutionally decided by a bankruptcy judge. *See Stern v. Marshall*, 564 U.S. 462, 499 (2011).

### III. Legal Analysis

*A. Reopening Standards*

A closed bankruptcy case may be reopened "to administer assets, to accord relief to the debtor, or for other cause." 11 U.S.C. §350(b). A bankruptcy court is not required to reopen a case when requested to do so; rather, a decision regarding reopening is within the sound discretion of the court. *Matter of Bianucci,* 4 F.3d 526, 528 (7th Cir. 1993) (citations omitted). In considering whether to reopen, a court should consider whether, upon reopening, it may exercise jurisdiction over whatever issue is sought to be resolved in the reopened case. *In re Hanks,* 182 B.R. 930, 936 (Bankr. N.D. Ga. 1995). If the matter to be resolved involves issues of state law and an adequate remedy is available in the state court, reopening may not be necessary or appropriate. *In re Davis,* 604 B.R. 807, 809-10 (Bankr. E.D. Ark. 2019); *In re Gianopolous,* 584 B.R. 598, 609 (Bankr. S.D.N.Y. 2018). The party seeking to reopen has the burden of establishing the requisite cause. *In re Covelli,* 550 B.R. 256, 263 (Bankr. S.D.N.Y. 2016) (citations omitted).

In considering the request to reopen here, it is clear that the Debtor, TTC, is not seeking any relief. TTC is fully liquidated and has no interest in the outcome of the Motion to Reopen or in the underlying issues that caused the Motion to Reopen to be filed.[6] Likewise, a decision either way on the Motion to Reopen will

---

[6] TTC was represented by Attorney John Lipinsky throughout the case. Attorney Lipinsky now represents Oak Point with respect to the Motion to Reopen. Attorney Lipinsky's involvement does not result in TTC having an interest in the outcome of the Motion to Reopen; rather, it is a detail that causes some confusion in reviewing Oak Point's argument. Some of Oak Point's arguments, such as its suggestion that IDOR and its attorneys should be sanctioned for not turning over the taxes paid under protest to TTC upon the bankruptcy filing, sound as if they are being made by TTC rather than Oak Point. Only TTC could have raised the issue of whether IDOR was a custodian required to turn over the funds in the bankruptcy case. And Oak Point only has a potential claim

not result in assets being available for administration. The taxes paid under protest will either be retained by IDOR or refunded to Oak Point. Nothing will be available for administration or distribution to other creditors.

Thus, the only issue remaining is whether Oak Point has established other cause for reopening. A review of the Protest Monies Act and the pending state court litigation is required to determine whether such cause has been shown. This Court must consider whether the issues raised in the state court litigation have been resolved by prior orders entered in this case, and if not, whether this Court should reopen the case and exercise jurisdiction over the pending dispute or, alternatively, whether Oak Point and IDOR have an adequate remedy in the state court to resolve the pending dispute.

## B. The Protest Monies Act

Generally, departments, agencies, boards, commissions, and others authorized to collect funds due to the State of Illinois, are required to deposit any funds so collected with the State Treasurer on a regular basis. 30 ILCS 230/2. When an individual or entity pays money that the State claims is due, but makes the payment under protest, the State Treasurer is required to hold the funds for 30 days "in a special fund known as the protest fund." 30 ILCS 230/2a. If during that 30 day period the party making the payment under protest files a complaint in a circuit court of the State and obtains a temporary restraining order or

---

now to the taxes paid under protest because the Protest Monies Act issues were not raised and resolved when the bankruptcy was pending. How raising the custodian argument—an argument that, as will be discussed below, is without merit in any event—helps Oak Point is really unclear.

injunction against the State Treasurer, then the funds must be held by the State Treasurer in the protest fund until "the final order or judgment of the court." *Id.* If no litigation is filed within 30 days or an injunction is not obtained, the funds are transferred by the State Treasurer to whatever account the money would have gone to absent the protest payment. IDOR is a department of the State of Illinois subject to the Protest Monies Act.

Here, TTC appears to have complied with the Protest Monies Act. It made its payment under protest and promptly filed its complaint in the Circuit Court of Cook County. According to both TTC and IDOR, injunctive relief was timely obtained directing the State Treasurer to hold TTC's payment in the protest fund pending further order of the state court. The taxes paid under protest by TTC remain in the protest fund at this time. Thus, the question to be answered is what interest IDOR and TTC had in the money held in the protest fund when this case was filed.

IDOR correctly points out that the characterization of property interests is generally a matter of state law. *Butner v. U.S.*, 440 U.S. 48, 54 (1978). The Illinois Supreme Court has spoken at least twice regarding the nature of the property interests of the State and the taxpayer when taxes are paid under protest and a Protest Monies Act case is filed. In *People v. Roth, Inc.*, 412 Ill. 446 (1952), the Illinois Supreme Court said that "the State had and retained a special title in the protested amount from the time of its deposit[.]" *Id.* at 451. Pending litigation would result in the vesting of "full title" in the State or a divestiture in favor of the taxpayer. *Id.* More recently, the Illinois Supreme Court has characterized the property interest of the taxpayer paying under protest as the right to "file suit for

a refund[.]" *Hartney Fuel Oil Co. v. Hamer*, 2013 IL 115130, ¶18 (2013). When a taxpayer is actually willing to pay taxes under protest, the taxpayer obtains the benefit of bypassing the need to exhaust "all administrative remedies before seeking judicial review." *Id.* And if the taxpayer loses the Protest Monies Act case, the taxpayer is credited with having paid the taxes as of the time the payment under protest was made. *Roth*, 412 Ill. at 451.

Based on Illinois law, it is clear that the State of Illinois and IDOR had a vested property interest in and "special title" to the taxes paid by TTC under protest. TTC retained the right to seek a refund of the amount paid under protest, and its cause of action, pending in Cook County when the bankruptcy case was filed, was property of the estate. Because the underlying issue of whether the taxes were due has not been litigated, IDOR and the State retain their vested property interest and have "special title" to the monies held in the protest fund. Oak Point makes several arguments to the contrary, asserting that it should receive immediate turnover of the protest funds. None of its arguments are persuasive.

Oak Point argues that, notwithstanding the pending Protest Monies Act litigation and the provisions of Illinois law that control that litigation, IDOR had a duty to turn over the protest money funds to TTC immediately upon the filing of this case. Oak Point claims that IDOR and the State Treasurer are custodians and that a custodian is required to turn over to a trustee or debtor-in-possession "property of the debtor" held by the custodian at the time a case is filed. 11 U.S.C. §543(b)(1). But "custodian" is a defined term under the Code and includes a receiver or trustee appointed in a case other than the bankruptcy case, an

-11-

assignee under an assignment for benefit of creditors, or a trustee, receiver, or agent authorized by law or contract to take possession of a debtor's property to enforce lien rights or to administer assets for the benefit of creditors. 11 U.S.C. §101(11).

Neither the State Treasurer nor IDOR was serving as a receiver or trustee and neither was acting as an assignee for the benefit of creditors. The State Treasurer is not holding the funds based on being appointed to do so by another court; the State Treasurer holds the funds pursuant to TTC's deposit and the requirements of Illinois law. The injunction entered by the state court requires that the funds be held in a special account as required by statute, but the State Treasurer does not hold the funds pursuant to a state court appointment. Finally, neither the State Treasurer nor IDOR are holding the funds for the benefit of TTC's creditors. Entities that hold funds on their own account or for purposes not set forth in the statutory definition, are generally not custodians who must turn over funds to the trustee. To be required to turn over assets under §543(b)(1), "an entity must be engaged in the general administration of the debtor's assets for the benefit of creditors." *In re Camdenton United Super, Inc.*, 140 B.R. 523, 525 (Bankr. W.D. Mo. 1992) (relying on *Cash Currency Exchange v. Shine (In re Cash Currency Exchange)* 762 F.2d 542, 553 (7th Cir. 1985)) (other citations omitted).

In finding that neither the State Treasurer nor IDOR is a custodian as defined by the Code, this Court is cognizant of the fact that the Protest Monies Act provides that "no one is to act as a custodian" of protest monies funds other than the State Treasurer. 30 ILCS 230/2a. But there is no indication that the term "custodian" was used in the Illinois statute in anything other than a generic sense.

The term is contained in a provision that specifically provides that clerks of court, banks, and other persons such as trustees may not hold protest monies funds. Thus, the term is used in the Protest Monies Act in a different context and for a different purpose than the term is used in the Code. Neither the State Treasurer nor IDOR is a custodian of the protest monies fund with a duty to turn over those funds to TTC when the case was filed or to Oak Point now under §543(b)(1).

Oak Point also argues that continuation of the Protest Monies Act litigation violates the injunction contained in TTC's confirmed liquidating plan. Specifically, Oak Point relies on the highlighted plan provisions below:

> 15.1 <u>Discharge Injunction.</u> On the Effective Date, the rights afforded in the Plan and **the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge and release of Claims and Interests of any nature. All Persons shall be precluded from asserting against Debtors, their successors or their assets any other or further Claims or Interests based on any omission, transaction or other activity that occurred before the Effective Date.**
>
> a) Except as is otherwise provided for in the Plan, effective on the Effective Date, **all persons shall be enjoined and stayed from taking any of the following actions against or affecting Debtors, or the Assets** (other than actions brought to enforce any rights or obligations hereunder or appeals, if any, from the Confirmation Order with respect to any Claims):
>
> i) **commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against Debtors or the Assets, on account of any Claim**;
>
> ii) **enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against Debtors or the Assets**;

> > > iii) **taking any act to** (x), **obtain possession of any Assets**, or
> > > of property from the Debtors or the Assets; or (y) **exercise
> > > control over or use of any Assets**[.]

Motion to Reopen, at 7-8, n.6 (#1978).

The language relied on by Oak Point largely tracks and appears to be modeled on the automatic stay and discharge provisions of the Code. 11 U.S.C. §§362, 524. Those provisions limit actions against debtors or the property of debtors and their estates. In this case, all persons are enjoined from continuing suits or actions against TTC or from taking actions to collect judgments against TTC by obtaining possession or control over TTC's assets. But to find that the actions of IDOR in now seeking to end the pending state court action violate the plan injunction would require a mischaracterization of the Protest Monies Act litigation.

The Protest Monies Act litigation is not a suit or action against TTC; it is a suit brought by TTC against IDOR and officers of the State of Illinois. If IDOR prevails in the litigation, no collection action against TTC or any other person or entity will occur; the deposit made by TTC in 1998 will be deemed as payment by TTC of the amounts due for the disputed taxes. In considering the similar language of §362 regarding the automatic stay, the Seventh Circuit has pointed out that the restrictions on taking action against a debtor do not apply to suits brought by a debtor. *Martin-Trigona v. Champion Fed. Sav. and Loan Ass'n*, 892 F.2d 575, 577 (7th Cir. 1989). The provisions of the automatic stay, the statutory discharge injunction, and, most certainly, the injunction contained in TTC's confirmed plan all serve the same purpose. That is to provide for an orderly liquidation of a debtor's property and to "prevent creditors from trying to steal a

march on each other[.]" *Id.* (relying on *In re Holtkamp*, 669 F.2d 505, 508 (7th Cir.

1982)). But when a debtor has filed the action in the first place, public policy does

not compel limiting continuation of pending litigation. *Id.*

Here, nothing in the plan injunction prohibits parties against whom

litigation had been filed or might be filed by TTC from raising procedural or

substantive defenses to defeat TTC's claims. Nothing in the plan injunction

resulted in any automatic victory for TTC in any pending or anticipated litigation.

To the contrary, TTC spent several years after the entry of the injunction, litigating

its claims against third parties. Although neither TTC nor IDOR sought to move

the Protest Monies Act case along during the bankruptcy proceedings, the entry

of the injunction, in and of itself, had no impact on the outcome of the state court

case. The plan injunction does not prohibit IDOR from raising its defenses now or

from seeking to have the pending case dismissed or otherwise resolved. *Id.*

IDOR says that, upon the filing of this case, the Protest Monies Act case was

transferred to the bankruptcy calendar of the Cook County circuit court, and that

is where the case remains. IDOR also says that Oak Point recently filed a motion

in the state court case asking for turnover of the protest funds, which was

summarily denied because Oak Point had not properly intervened in the case and

had not sought to move the case from the bankruptcy calendar to active status.

The Motion to Reopen was filed here when IDOR filed a motion in the state court

to move the case to active status.

Placement of the Protest Monies Act case on the state court bankruptcy

calendar may not have been necessary because, as discussed above, the case was

brought by TTC to obtain a refund of taxes paid and therefore was not subject to

the automatic stay. 11 U.S.C. §362(a)(1), (3). But the transfer to the bankruptcy calendar was, most likely, based on an abundance of caution, and moving the case to active status now does not violate the plan injunction or any provisions of the Code. Likewise, IDOR's current efforts to have the case dismissed or otherwise resolved do not violate the plan injunction or any provision of the Code. Such actions are not against the Debtor, TTC, or its successor; they are simply actions to resolve issues that TTC originally brought seeking relief from IDOR. Nothing about the plan injunction requires IDOR to concede those contested issues now.

Oak Point's last argument in support of its requested relief is that IDOR lost its rights to the protest funds when its claim for 1997 taxes was disallowed as untimely filed. But Oak Point is simply wrong on that point. The disallowance of IDOR's claim did not reach the substance or merits of the claim and, in particular, did not address the issues raised in the Protest Monies Act case.

In Chapter 11 cases, creditors whose claims are scheduled as disputed, contingent, or unliquidated must file claims within the time prescribed by the court. Fed. R. Bankr. P. 3003(c)(2). IDOR was scheduled as having a disputed claim and, accordingly, was required to file a claim if it wanted to share in the plan distributions. IDOR timely filed several claims, but this Court disallowed IDOR's claim for 1997 taxes as late-filed. The impact of such disallowance is the same as if the claim had never been filed. In the absence of a timely-filed claim, a creditor may not "be treated as a creditor . . . for the purposes of voting and distribution." *Id.* By the time IDOR's claim for 1997 taxes was disallowed, TTC's liquidating plan had been confirmed for years, so the voting issue was moot. And the amounts available for distribution under TTC's confirmed plan were limited;

IDOR's allowed priority claims were not paid in full. Neither the Code nor Rules imposes any consequence on IDOR for not filing a timely claim other than the limits on voting and distribution. There is no authority for Oak Point's proposition that the absence of a timely-filed claim related to the protest funds resulted in a substantive loss for IDOR in the pending state court litigation.

It is also questionable whether IDOR could have or should have even filed a claim in this case for the taxes involved in the Protest Monies Act litigation. By the time this case was filed, IDOR had been paid the taxes, albeit under protest, the State Treasurer had the funds in an account, and, if IDOR prevailed in the pending litigation, the taxes would have been deemed paid as of the 1998 deposit. Thus, it is unclear what IDOR could have claimed was due from TTC related to the Protest Monies Act case. There would have beeen no basis for IDOR to claim that any more was due from TTC for those taxes, and IDOR should not have been able to share in whatever distribution might have been available for TTC's creditors based on the taxes at issue in the Protest Monies Act case. Rather, it seems likely that if IDOR had filed a separate, timely claim for the $46,000 at issue in the Protest Monies Act case, TTC would have correctly objected to the claim on the basis that the claimed amount had been paid and that, even if TTC lost the pending state court case, nothing further would be due to IDOR. Because IDOR had been paid the taxes at issue in the Protest Monies Act case, there was no basis to make a claim for further payment of those taxes in this case. IDOR's failure to file such a claim did not result in a substantive loss of its rights in the pending state court action.

The Protest Monies Act case remains pending in state court. No orders of

this Court resolved the underlying dispute there or preclude IDOR from defending
its right to retain the taxes paid under protest by TTC in 1998. No orders of this
Court require either IDOR or the State Treasurer to turn over monies from the
protest fund to Oak Point.

*C. Denial of the Motion to Reopen*

Oak Point has requested that this case be reopened and that this Court
order IDOR and the State Treasurer to turn over the protest funds. Oak Point
claims that it is entitled to the funds as successor to TTC and that such an order
can be entered as a matter of law, without the need for further hearing. But based
on the above analysis of the underlying dispute between IDOR and TTC, that is
simply not the case. IDOR and the State of Illinois retain special title to the funds,
and they cannot be dispossessed of their interest in the funds without a decision
on the substantive merits of the dispute. The question then is whether Oak Point
has shown cause for the case to be reopened so that the merits of the underlying
dispute can be litigated here. The answer to that question is that Oak Point has
not shown any such cause.

If this case were reopened, it is unclear how the Protest Monies Act case
would be presented to this Court. IDOR appears to have no desire to remove the
matter from state court and Oak Point has not, at least according to IDOR,
properly intervened in the state court proceeding and, accordingly, is not a party
thereto. Only a "party" may remove a case based on a relationship to a bankruptcy
case. 28 U.S.C. §1452(a). But setting that and the other procedural issues
involved in the  removal of a 22-year-old case aside, it is clear that if the case were

removed to this Court, and if this Court were requested to abstain, mandatory abstention would apply.

When requested by a party to abstain, a court must do so even if the matter is related to a case under the Code, if the matter is "not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction" conveyed by the filing of a bankruptcy.[7] 11 U.S.C. §1334(c)(2). Such abstention is required "if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction." *Id.*

Here, the Protest Monies Act case does not arise under the Code—no issues related to any Code provision would be involved in resolving the tax dispute. Likewise, the dispute did not arise in or due to the filing of the bankruptcy—the parties were fully at issue in the state court years before the bankruptcy was filed. The original dispute could not have been filed in federal court originally—it raises issues solely of state law and is based on a statute that required the action be filed in a circuit court of the State of Illinois. The action has already been commenced in state court and, although there has been absolutely nothing timely about resolution of the Protest Monies Act case, most certainly, the state court can resolve the pending dispute now as quickly as this Court could. Thus, all of the

---

[7] For this Court to have jurisdiction at all, the matter must arise under title 11 or arise in or relate to a case or proceeding under title 11. 28 U.S.C. §1334(b). Here, it may be a stretch to find that the current matter is even "related to" TTC's bankruptcy case. When the case was originally open, the prospect of bringing the potential refund, if TTC prevailed on merits, into the estate might have been enough to make the Protest Monies Act case "related to" the bankruptcy. At this point, however, the refund, if any, goes to Oak Point. Exercising "related to" jurisdiction could be a tenuous proposition now.

requirements for mandatory abstention exist here.

Further, if the case were reopened but, for some reason, IDOR did not ask for mandatory abstention, this Court would, most certainly, exercise its option to permissibly abstain. 28 U.S.C. §1334(a). A court may permissibly abstain in "the interest of justice, or in the interest of comity with State courts or respect for State law[.]" *Id.* All of the underlying issues in the Protest Monies Act case involve interpretation of the Illinois tax laws.[8] There is no reason for this Court to decide those issues when, regardless of the outcome, there will be no impact on the administration of this bankruptcy case. In the interest of comity with our state courts and respect for Illinois law, permissive abstention would be appropriate here.

Because this Court will not hear the Protest Monies Act issues if this case is reopened, there is no reason to reopen. Oak Point has not met its burden to establish cause for reopening.

## IV. Conclusion

Oak Point seeks to have this case reopened and to have this Court immediately enter an order awarding it the funds previously deposited with the Illinois State Treasurer as TTC's payment of taxes under protest. Oak Point has, however, failed to establish any basis upon which such an order could be entered. The Protest Monies Act case remains pending in state court, and nothing that

---

[8] IDOR raised an additional issue in its response to the Motion to Reopen of whether, even it did not prevail in the Protest Monies Act case, it could then apply the refund due to TTC or its successor, to TTC's other unpaid taxes as is generally allowed by Illinois law. 35 ILCS 5/909(a). This issue is also solely one of Illinois law and properly decided by the state court if the issue is reached.

occurred in this case resulted in a decision in favor of TTC on the merits of that litigation. Likewise, no orders entered in this case prevent IDOR from seeking to have the state court litigation concluded on its merits.

If this Court were to reopen this case, the Protest Monies Act issues would remain unresolved, but this Court would not exercise jurisdiction to resolve them. The Protest Monies Act case belongs in state court, and that is where it will remain. This Court finds that nothing that occurred in this case presents an obstacle to the state court from reactivating the case and proceeding to resolve whatever issues, procedural or substantive, are before it.

Oak Point has not met its burden to establish cause for this case to be reopened. The Motion to Reopen will therefore be denied.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

###